HARRISON (McCALL v.). See Case No. 8,-671.

## Case No. 6,139.

### HARRISON v. McLAREN.

[10 N. B. R. (1874) 244.][1]

District Court, S. D. Mississippi.

BANKRUPTCY — PROOF OF DEBT — PREFERENCE — SHIPMENTS BEFORE BANKRUPTCY BUT AFTER INSOLVENCY.

1. A. & Co. had been for a number of years the commission merchants of the bankrupts, who were merchants, dealing mainly in cotton. They advanced a large sum of money to the bankrupts, supposing that they had advanced the entire cash capital required by the bankrupts, and expected in return to receive all the cotton shipped by them. Notes of the bankrupts were presented for payment at the office of A. & Co., and were protested for nonpayment. A short time after this, one of the bankrupts visited A. & Co., and informed them that they were hard pressed, that they owed a large debt besides that due to A. & Co., and requested aid in arranging it. A. then went to the place of residence of the bankrupts and obtained a judgment for the amount due his firm, with the intention thus to receive the entire estate for

---

[1] [Reprinted by permission.]

an equal distribution among the creditors. On a motion to expunge the proof of debt of A. & Co., *held,* that they had reasonable cause to believe their debtors insolvent before obtaining their judgment.

[Cited in Harris v. Hanover Nat. Bank, 15 Fed. 788.]

2. Shipments of cotton after the insolvency to A. & Co., when they made advances at the time to the bankrupts, were not a preference, but in effect a sale of so much cotton to procure the necessary means to realize upon their assets.

In bankruptcy.

HILL, District Judge. The question now presented arises upon the application of the trustees of the estate of the bankrupts, to expunge the claim of T. H. and J. M. Allen & Co., answer, exhibits, and proof. The application alleges that the said creditors received from the bankrupts large shipments of cotton, which they sold, and applied the proceeds to the payment of their debts; that at the time this was done, the bankrupts were insolvent, and that the shipments so made were done with intent to give said creditors a preference over their other creditors, and that said creditors when they received such shipments knew, or had sufficient and reasonable cause to believe the bankrupts insolvent, and that the shipments were made with the intent to give such preference. Allen & Co. admit the reception of the cotton, but deny that they knew, or had cause to believe, the bankrupts insolvent, until the 16th of November, 1873; also deny that they knew that there was any intention, on the part of the bankrupts, to give them a preference over other creditors. Upon the issue as thus made, both parties have submitted proof, which has been duly considered, and from which I am satisfied there was not such intentional fraud as to deprive these creditors from a pro rata share with the other creditors, they agreeing to account for any part of the proceeds of the sale of said cotton, to which the court may deem them not entitled, to the exclusion of the other creditors.

The question for decision is, as to whether or not, when the cotton was received, these creditors knew, or had reasonable cause to believe the bankrupts insolvent, and that the shipments made were intended as a preference, and did Allen & Co. then know or have reasonable cause to believe the existence of these facts, the insolvency of the bankrupts at the time being admitted? Allen & Co. had for a number of years been the commission merchants of the bankrupts, who had advanced them money, accepted and paid their drafts, notes, and other obligations, to a large amount; the bankrupts were merchants in Yazoo City, and as such advanced to the planters money and supplies of all kinds necessary to enable them to carry on their planting operations, and who in payment agreed to deliver their cotton crops to the bankrupts, which cotton, by agreement

with Allen & Co., was to be shipped to them in New Orleans, to be sold by them as factors and commission merchants, and after payment of commissions and charges, the net proceeds of sales were to be placed to the credit of the bankrupts upon the advances made. Such was the agreement and usual mode of dealing between the parties. Allen & Co. agreed with Harrison & McLaren to advance to them during the commercial year ending the 1st of September, 1873, the sum of seventy thousand dollars, to be paid in the mode stated, and did advance that amount, and something more, showing a balance of seventy-five thousand dollars due Allen & Co. 1st September, 1873, Allen & Co., believing that the only indebtedness of Harrison & McLaren was to them, as they supposed they had advanced the entire cash capital and credit being employed by Harrison & McLaren, and expected in return to receive all the cotton shipped by them. On the 8th of October, 1873, a small note of a few hundred dollars, made payable to another party, but payable at Allen & Co.'s office, in New Orleans, was presented for payment, and protested. On the 28th and 30th of the same month, two other notes, payable to other parties, at the office of Allen & Co., were presented for payment, and protested; these notes were, together, for ———. On the 16th of November, Harrison visited New Orleans, and informed Allen & Co. that they were hard pressed; that they owed a large debt beside that due to Allen & Co., and requested aid in arranging it, which Allen & Co. were unable to do, under the money panic then prevailing. J. M. Allen, a member of the firm, having this, and other mercantile matters in Mississippi, especially in charge, returned with Harrison to Yazoo City, where he found numerous creditors pressing for payment, and the debtors unable to pay, and advised Harrison & McLaren to go immediately into liquidation. He also found the creditors endeavoring to sell their claims to the debtors of the bankrupts, to arrest which, by obtaining judgment and garnishment on the debtors, he was advised to obtain judgment on his debt against Harrison & McLaren, and summon the debtors as garnishees, and by agreement with the bankrupts, a judgment was entered in the circuit court of Yazoo county, then sitting, but which was set aside. J. M. Allen testifies that there was no intention to set up this judgment as a lien, but to secure the entire estate for an equal distribution among the creditors, and there is no reason to doubt the correctness of this statement. The business was carried on between Allen & Co. and Harrison & McLaren, up to this visit to Yazoo City, Allen & Co. continuing to make advances, and to receive shipments of cotton, the latter greatly exceeding the former.

The principles of the bankrupt law [of 1867 (14 Stat. 517)] are pretty well settled; the difficulty is in applying them to the facts of

the case as above stated. The insolvency being admitted, the next question is, when did Allen & Co. have reasonable cause to believe it? Whenever a knowledge of such facts was brought home to them, which would lead a prudent man, having the interest which they had in the inquiries, to inquire into the pecuniary condition of their debtors, which inquiry, when made, would have developed their insolvency. It is well settled that commercial insolvency under the bankrupt law is the inability of a merchant, banker, trader, manufacturer, or miner, to meet and pay his commercial debts as they fall due in the usual course of business; not that his property, when sold under legal process, is insufficient to pay all his debts. This last may be termed legal insolvency. Under ordinary circumstances, when a merchant permits his commercial paper to go to protest, it would afford a strong presumption against his commercial solvency, subject, as a matter of course, to be rebutted by evidence, but these presumptions must be considered in the light of surrounding circumstances at the time. The first note was protested during the money panic, and may be held as rebutting the presumption raised by the non-payment of this note. And, were it not for other circumstances, might be held as rebutting the presumption arising from the non-payment of the other notes. But, after the non-payment of the first note, there were, to November 1st, presented for payment, and which were not paid, at the office of Allen & Co., commercial paper of the bankrupts in all, the sum of —— dollars. It must be remembered that Allen & Co. did not suppose the bankrupts were indebted to others to any considerable sum up to the presentation of these notes; but this being known, it was reasonable to suppose that these were not all the debts they owed, and it does seem to me that as prudent men as these creditors are shown to be, they should, by this time (November 1st), have made inquiry, and which they no doubt would have done but for the paralysis produced by the panic, and which inquiry would have developed the insolvency, both commercial and legal, of Harrison & McLaren, their debtors; and such being the case, must be held to have had reasonable cause to believe them insolvent the 5th of November, by which time the inquiry might have been made.

The next question is, were these shipments made with the intent to give them a preference? The deposition of neither Harrison or McLaren has been taken on this subject. It is urged in argument that these shipments were made in the usual course of business, and therefore negatives such intent; but Harrison & McLaren must have known their commercial insolvency; that is, that they could not pay their commercial paper as it fell due in the usual course of business, and, if they knew anything about their business, must have had reasonable cause to believe

themselves legally insolvent. Such being the case, they must have known that the placing of all the cotton they could command in the possession of Allen & Co., their principal creditors, was giving them a preference; that it was such preference there can be no doubt, and, according to an old and well settled rule, they must be presumed to have intended the natural result of their own act; and there is no proof to rebut this presumption—the reasons are all in its favor. Allen & Co. had supplied them with means to a large amount, indeed, had furnished the means upon which they had carried on business for years. They doubtless felt under more obligations to them than all their other creditors together—like all men, when sinking, looked to some one for help, and looked to these friends. This help could not reasonably be expected but by placing all their cotton, as soon as they could get it, in the possession of these large creditors. This was natural and nothing morally wrong, and only forbidden by the policy of the bankrupt law. It is ingeniously and forcibly urged on behalf of these creditors, that all the shipments made after September 1st do not amount to more than the pro rata share of these creditors, and therefore cannot be deemed an intended preference, or a preference at all; that if a merchant has only enough to pay half his indebtedness, he may, without any violation of the bankrupt law, pay each creditor half what he owes him. This is very plausible, but practically will be found of difficult application, if such a case could be found. The payment to one of that amount would be a bird in his hand, whilst the others would only have a bird in the bush, which would give the former a preference; but it is evident such was not the intention of these parties, but is exactly what their creditors resist. They ask to keep all the birds they have, and an equal division of those afterward caught. Under the proof, these shipments received after the 5th of November, must be held as intended preferences.

The remaining question is, did Allen & Co. know, or have reasonable cause to believe they were preferences, and so intended? That they were preferences in point of fact, cannot successfully be denied; and that, under the principles stated, they must be held as having been so intended, I believe equally well established. That Allen & Co. must be held to a knowledge of that which it was their duty to know, or, in other words, cannot take advantage of their ignorance to the prejudice of others holding equal rights under the law; and, such being the case, must be held as knowing the result of the reception of those shipments as an intended preference in all received after the 5th of November. It is urged, on behalf of these creditors, that the advances made after this time, or up to the suspension, negative all such knowledge; but this by no means follows. It was their interest to make these advances.

This was necessary in order to procure the cotton. If Harrison & McLaren refused to make further advances to their customers, the cotton would be withheld, and if these creditors did not furnish the means to them, they could not furnish their customers; besides, would have been induced to ship to those who would furnish them. It is also urged that, under the bankrupt law, the balances must be struck at the commencement of the proceedings in bankruptcy. This is so when there have been no intentional preferences made on the credit side of the debtor's account; but to allow such intended preferences would defeat the very policy and object of the bankrupt law—that is, equality among the creditors. But this rule is not disturbed by giving credit for the advances made after the 5th November, upon the shipments received after that date. This was, in effect, a sale of so much cotton to procure the necessary means to realize the assets of these failing merchants. All the cotton received before the 5th November, when received, vested in Allen & Co. a lien for the payment of the balance then due them; consequently the proceeds of the sale of such cotton should be credited upon the balance then due.

I am referred, on behalf of these creditors, to the case of Tiffany v. Lucas, 15 Wall. [82 U. S.] 410. This case, when examined, does not apply to the present. That was a case of sale to one not a creditor, and not a preference. Also to the case of Wilson v. City Bank [17 Wall. (84 U. S.) 473]. That was a case of a judgment-lien, without any aid or assent on the part of the defendant, beyond mere passive non-resistance; but the court holds that a very slight circumstance showing an affirmative desire upon the part of the debtor, would change the rule. Then the subsequent advances should be credited upon the proceeds of the sales of the cotton received after the 5th November, and the balance of such proceeds added to the amount of assets subject to general distribution, and charged to Allen & Co. upon the amount of their dividend, it being admitted that their dividend will amount to more than such balance, or if it should, only the balance need be paid over. The account of Allen & Co. does not show the dates at which the cotton was received by them, but only the date of the sales, and there is no proof in the record supplying these dates, consequently the case must go to the auditors for proof, and an account showing the net proceeds of the sales of the cotton received by Allen & Co. after the 5th of November, the advances made after that time, and the balance of such net proceeds of sales, after giving credit for such advances.